## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SCOTT SCHWARTZ, Individually and on behalf of all others similarly situated,

              Plaintiff,

   v.

LATCH, INC., LUKE SCHOENFELDER, ROBERT J. SPEYER, PAUL A. GALIANO, JENNUY WONG, JOSHUA KAZAM, JENNIFER RUBIO, NED SEGAL, MICHELANGELO VOLPI, PETER CAMPBELL, TRICIA HAN, RAJU RISHI, J. ALLEN SMITH, and ANDREW SUGRUE,

              Defendants.

C.A. No.

**JURY TRIAL DEMANDED**

**CLASS ACTION**

## CLASS ACTION COMPLAINT

Plaintiff Scott Schwartz ("Plaintiff" or "Schwartz"), individually and on behalf of all other similarly situated, current and former stockholders of pre-merger Latch, Inc. (referred to throughout as "Legacy Latch"), brings this Verified Class Action Complaint asserting claims arising from the merger of Legacy Latch with and into Lionet Merger Sub, Inc., a wholly owned subsidiary of TS Innovation Acquisitions Corp., for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), against defendants Luke Schoenfelder, Robert J. Speyer, Paul A. Galiano, Jenny Wong, Joshua Kazam, Jennifer Rubio, Ned Segal, Michelangelo Volpi, Peter Campbell, Tricia Han, Faju Rishi, J. Allen Smith and Andrew Sugrue; in their capacities as members of (a) Latch, Inc.'s ("Latch" or the "Company") board of directors (the "Board") and/or officers; and (b) signatories of the relevant Registration Statement, as defined herein.

The allegations are based on Plaintiff's knowledge as to himself, and on information and belief, based upon counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Latch with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Latch; (c) review of other publicly available information concerning Latch; and (d) interviews with a former Latch executive.

## NATURE OF THE CASE AND OVERVIEW

1.      This is a securities class action on behalf of a class consisting of all persons and entities that were Legacy Latch shareholders and acquired publicly traded securities of Latch through its June 4, 2021, merger pursuant to Latch's registration statement and prospectus issued in connection with Latch's June 4, 2021 issuance of stock (the "Pre-Merger Registration Statement" or "Registration Statement" as defined herein). The claims asserted herein arise under Sections 11 and 15 of the Securities Act.

2.      Latch is a technology company offering smart locks and a full operating system, LatchOS, to address entry, guest management, and other access control for residential buildings. Latch went public via a special purpose acquisition company or "SPAC," by merger approved June 3, 2021 (the "Merger"). The Merger closed on June 4, 2021, and Latch began trading on the NASDAQ exchange under the trading symbol "LTCH" on June 7, 2021.

3.      On August 10, 2022, Latch filed a Form 12b-25 Notification of Late Filing with the SEC, noting that the Board of Directors Audit Committee had commenced an investigation that included, but may not be limited to, "certain aspects of the Company's current and historic key performance indicators and revenue recognition practices, including the accounting treatment, financial reporting and internal controls related thereto." As a result, Latch announced it

would not be filing its timely quarterly report.

4.     On August 25, 2022, after the market closed, Latch filed a form 8-K stating that "[b]ased on the preliminary findings of the Investigation, certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures" and that the company would be restating its consolidated financial statements for 2021 and 2022 as a result.

5.     Latch's stock price fell $0.13, or 12.2%, to close at $0.95 per share on August 26, 2022, following this announcement. Right after the Merger, Latch's stock traded for as high as $11.27.

6.     On November 10, 2022, Latch filed another Form 12b-25 Notification of Late Filing with the SEC, again citing the Audit Committee's investigation and stating that it had been "expanded to include an investigation of the Company's financial statements for 2019 and 2020"—which notably pre-date the Merger.

7.     The crash of Latch's stock caused financial losses for Plaintiff and putative class members.

8.     Plaintiff and putative class members seek to hold Defendants responsible for violations of Section 11 of the Securities Act, in connection with materially false and misleading statements made in the Pre-Merger Registration Statement that Defendants knew and/or recklessly disregarded were materially false

and misleading when made and/or that omitted information necessary to make Defendants' statements true accurate, and reliable. Plaintiff, through undersigned counsel, makes these allegations upon personal knowledge and upon information and belief based on the investigation of counsel.

9.      Specifically, Latch's Pre-Merger Registration Statement materially misrepresented nearly every "Key Business Metric", including, but not limited to: (1) falsely representing its sales revenue which was based primarily on bookings of non-binding letters of intent that in reality in no way could lead to the revenue Latch projected; (2) grossly misrepresenting the "typical" timeline for converting a letter of intent into a sale; (3) misrepresenting the ease and feasibility of retrofitting buildings booked in connection with the letters of intent; (4) inflating hardware sales by delivering hardware to clients before projects were due to begin in order to recognize additional revenue on a quarterly basis; (5) touting technology and products that either did not have a proof of concept and would not be usable or deliverable; and (6) overstating the "international market" Latch had and would be able to expand into.

10.      As described herein, the disclosures surrounding the deal were not just marginally flawed, but affirmatively false and misleading. The result has been a financial catastrophe and the Company's stock price has plummeted.  Indeed, the Company's shares—which had traded around $10 at the time of the Merger—closed

recently at under $0.67 per share on December 29, 2022.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 21 of the Securities Act (15 U.S.C. § 77v).

14.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.    Plaintiff Schwartz is a former Legacy Latch employee and acquired Latch securities pursuant and/or traceable to the Pre-Merger Registration Statement issued in connection with the Company's June 4, 2021 issuance of stock.

17.    Defendant Latch is a Delaware corporation, headquartered in New

York and transacting business in this district. Since June 7, 2021, Latch's securities trade on the NASDAQ under the symbol "LTCH."

18.     Latch is the surviving entity of a merger between Lionet Merger Sub, Inc., a wholly owned subsidiary of TS Innovation Acquisitions Corp. ("TSIA") and Legacy Latch.  Prior to June 7, 2021, TSIA's securities traded on the NASDAQ under the symbols "TSIAU," "TSIA," and "TSIAW." Pursuant to the Merger, as explained herein, all holders of common stock in Legacy Latch received shares of common stock in TSIA. TSIA was then renamed Latch, Inc. and its common stock began trading on the NASDAQ under the symbol LTCH.

19.     Defendant Luke Schoenfelder ("Schoenfelder") served as Legacy Latch's Chief Executive Officer, was named in the Registration Statement as being or about to become a director of the Company, and in fact serves as Chairman of the Company's board of directors.

20.     Defendant Robert J. Speyer ("Speyer") was, at all relevant times, a director of the Company, and signed and/or or authorized the signing of the Company's Registration Statement filed with the SEC.

21.     Defendant Paul A. Galiano ("Galiano") was, at all relevant times, a director of TSIA, and signed and/or authorized the signing of the Company's Registration Statement filed with the SEC.

22.     Defendant Jenny Wong ("Wong") was, at all relevant times, a director

of TSIA, and signed and/or authorized the signing of the Company's Registration Statement filed with the SEC.

23.    Defendant Joshua Kazam ("Kazam") was, at all relevant times, a director of TSIA, and signed and/or authorized the signing of the Company's Registration Statement filed with the SEC.

24.    Defendant Jennifer Rubio ("Rubio") was, at all relevant times, a director of TSIA, and signed and/or authorized the signing of the Company's Registration Statement filed with the SEC.

25.    Defendant Ned Segal ("Segal") was, at all relevant times,  a director of TSIA, and signed and/or authorized the signing of the Company's Registration Statement filed with the SEC.

26.    Defendant Michelangelo Volpi ("Volpi") was, at all relevant times, a director of TSIA, and signed and/or authorized the signing of the Company's Registration Statement filed with the SEC.

27.    Defendant Peter Campbell ("Campbell") was named in the Registration Statement as being or about to become a director of the Company and did in fact serve as a director of the Company.

28.    Defendant Tricia Han ("Han") was named in the Registration Statement as being or about to become a director of the Company and did in fact serve as a director of the Company.

29.     Defendants Schoenfelder, Speyer, Galiano, Wong, Kazam, Rubio, Segal, Volpi, Campbell, Han, Rishi, Smith, and Sugrue are at times collectively referred to herein as the "Director Defendants" or the "Individual Defendants."

30.     The Director Defendants, and Latch are collectively referred to herein as "Defendants".

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware on behalf of himself and on behalf of all persons and entities that were Legacy Latch shareholders prior to the Merger and acquired Latch securities issued through the Company's Merger and pursuant to the Pre-Merger Registration Statement (the "Class"). Excluded from the Class are Defendants, the officers and directors of Latch, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are at least hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Latch or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> a.     Whether Defendants violated the Securities Act;
>
> b.     Whether the Registration Statement omitted and/or misrepresented material facts about the business, operations, and prospects of Latch; and
>
> c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

37.     Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background on the Company and its Merger with TSIA

38.     Legacy Latch was founded in 2014 by defendant Schoenfelder and Defendant Jones, as a maker of smart locks and building management software.

39.     TSIA was a blank check company incorporated in Delaware on September 18, 2020 for the purpose of "effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or other similar business combination[.]"[1]

40.     TSIA was a SPAC, a vehicle commonly used to take an entity public. At its formation a SPAC has no commercial operations; instead, it raises money through an initial public offering ("IPO") with the intention of using the funds to acquire a target company to be identified after the IPO. The SPAC and the target company typically merge, resulting in an operating company with publicly traded shares.[2]

---

[1] TSIA's 2020 10-K, at 2.
[2] *See generally* Gregory A. Markel, et al., *Legal Update, Considering a SPAC Transaction? Keeping Securities Litigation Risks at Top-of-Mind*, City Bar Center for Continuing Legal Education (Mar. 19, 2021).

41.     TSIA went public through an IPO in November 2020. On November 5, 2020, TSIA published a Form S-1 Registration Statement to register 34,500,000 Units, each consisting of 1 share of common stock and one-third of a redeemable warrant, for a proposed maximum aggregate offering price of $345,000,000. The S-1 became effective on November 9, 2020. Ultimately, TSIA consummated an IPO of 30,000,000 units for $10 per unit, raising $300,000,000. The 10,000,000 of warrants were exercisable for $11.50 per share. TSIA's common stock was tradable on the NASDAQ exchange under the trading symbol "TSIA."

42.     On January 24, 2021, TSIA, through one of its subsidiaries, and Legacy Latch entered into the Merger Agreement. The Merger Agreement provided that TSIA would be the surviving entity, and would be renamed "Latch, Inc." (the entity herein referred to as "Latch"). On March 31, 2021, Latch announced its post-combination board of directors, including Rishi, Smith, Han, Sugrue, Schoenfelder, Campbell, and Speyer.

43.     On June 3, 2021, TSIA shareholders held a special meeting and approved the Merger Agreement. The Merger closed on June 4, 2021.

44.     In connection with the Merger, and pursuant to the Pre-Merger Registration Statement discussed below, at the Merger closing the Legacy Latch equityholders were to receive aggregate consideration of $1.0 billion, payable in newly issued shares of TSIA common stock. TSIA proposed to issue 81,654,173

new shares of stock in exchange for all of the common and preferred stock of Legacy Latch (at a 0.8971 exchange rate), and 100,000,000 shares total. Following the transaction, former Legacy Latch shareholders were expected to have 64.2% of the Class A common stock. The resulting company would be renamed Latch, and trade publicly under the symbol LTCH.

45.     Many former Legacy Latch employees who became Latch employees held options or stock which converted to equity interests in Latch as a result of the Merger.

46.     Plaintiff began working at Legacy Latch in June 2018. In connection with his employment agreement, he received stock options for the company's common stock.

47.     Plaintiff exercised certain stock options on March 22, 2021 and acquired Legacy Latch stock prior to the Merger.

48.     Following the Merger, and pursuant to the Pre-Merger Registration Statement, Plaintiff's shares in Legacy Latch were converted to shares in Latch.

49.     Plaintiff acquired Latch stock as a result of the Merger traceable to and pursuant to the Pre-Merger Registration Statement.

50.     On June 7, 2021, the date the new shares issued pursuant to the Pre-Merger Registration Statement hit the market, Latch's stock traded as high as $11.27. The share price has steadily declined since, with the stock price trading at

less than $0.95 as of August 26, 2022, and at $1.04 as of November 17, 2022.

## The Company's False and/or Misleading Registration Statement and Prospectus

51.    Latch (then named TSIA) filed a Form S-4 Registration Statement and Proxy/Prospectus with the SEC on March 10, 2021, in anticipation of the consummation of the Merger. Latch (then named TSIA) later filed amendments to the statement on March 30, 2021, May 3, 2021, May 10, 2021, and May 12, 2021 (collectively, with the March 10, 2021 statement the "Pre-Merger Registration Statement" or "Registration Statement"). The Pre-Merger Registration Statement was declared effective on May 12, 2021.

52.    The Pre-Merger Registration Statement announced the January 24, 2021 merger agreement between TSIA, through its subsidiary, and Legacy Latch.

53.    It also detailed that "[a]s part of the Business Combination, [Legacy] Latch equityholders will receive aggregate consideration of $1.0 billion, payable in newly issued shares of TSIA Class A common stock at a price of $10.00 per share . . . ."[3]

54.    It further provided that the TSIA board of directors "has unanimously approved the Merger Agreement and the transaction contemplated thereby and

---

[3] *See* Pre-Merger Registration Statement at p. iv.

recommends that TSIA stockholders vote" for the Merger and the related issuances.[4] Legacy Latch's board of directors also had unanimously approved the Merger Agreement and made the same recommendation.

55.    Defendant Speyer signed the proxy statement/prospectus in the Pre-Merger Registration Statement.

56.    Defendants Wong, Kazam, Rubio, Segal, and Volpi also executed the Pre-Merger Registration Statement.

57.    The Pre-Merger Registration Statement was negligently prepared and, as a result, contained untrue statement of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

58.    The Pre-Merger Registration Statement contained a number of material misrepresentations and omissions and failed to identify material risks to shareholders.

59.    These misrepresentations affect nearly every aspect of the "Key Business Metrics" identified in its Pre-Merger Registration Statement.

### *Material Misrepresentation of the Bookings based on LOIs*

60.    The Pre-Registration Merger Statement described Latch as "an enterprise technology company focused on revolutionizing the way people

---

[4] *See* Pre-Merger Registration Statement.

experience spaces by making spaces better places to live, work, and visit."[5]

61.    It described Latch's sales strategy as "simple, repeatable, scalable and unique."[6] But TSIA and Latch materially misrepresented Latch's sales revenue and bookings, which were primarily based on non-binding letters of intent ("LOIs"). Although mentioned frequently in the Pre-Merger Registration Statement, many assertions based on the LOIs were false and the LOIs were never mentioned as a risk factor. For example, the Pre-Merger Registration Statement first describes the LOIs in the "Company Overview" section supporting its supposedly "simple" and "scalable" sales strategy:

> Latch engages with customers early in their construction or renovation process, establishing Latch as a technology advisor to the building. This not only enables us to provide more technology advice early in the development process, ***but it also creates high revenue visibility. Our customers sign letters of intent ("LOIs") specifying which software and devices they want to receive and on which dates. This approach leads to multi-year software contracts, direct feedback loops with our customers and their residents, local and regional market insights, and a full picture of the ever-changing demands of building operators. With a delivery timeline that can range from an average of six to eighteen months after signing the LOI, depending on the construction schedule***, we continuously evolve our products and add new features between the time of signing of the LOI and the time of install.[7]

62.    In the section addressing Key Business Metrics, with regard to

---

[5] Pre-Merger Registration Statement at pp. viii, 14, 68 and 132.
[6] Pre-Merger Registration Statement at p. 133, 143.
[7] Pre-Merger Registration Statement at p. 133 (emphasis added).

Bookings, the Pre-Merger Registration Statement further states:

> We use Bookings to measure sales volume and velocity of our hardware and software products. ***Bookings represent written but non-binding LOIs from our customers to purchase Latch hardware products and software services, not reflecting discounts***. We sell software services with all our access hardware products. ***Based on historical experience, we believe there is sufficient or reasonable certainty about the customers' ability and intent to fulfill these commitments with a target delivery date no longer than 24 months following LOI signature***.[8]

63.     Later the Pre-Merger Registration Statement states an even shorter time frame for realizing LOIs when discussing another Key Business Metric, Booked Annual Recurring Revenue, stating,

> We use Booked Annual Recurring Revenue ("ARR") to assess the general health and trajectory of our recurring software. Booked ARR is defined as the cumulative value of annual recurring revenue from Latch software subscriptions that are under a signed LOI. We calculate Booked ARR by multiplying the total number of units that have been booked by the annual listed subscription pricing (excluding discounts) at the time of booking. ***LOIs typically deliver within 6 to 18 months of signing***, depending on construction timelines. Booked ARR is adjusted for bookings that do not ship within a normal construction time-frame. It should be viewed differently from Software Booking as it represents only the average annual software revenue, not the lifetime contract value.[9]

64.     These representations were material and false.

65.     In truth, an LOI was nothing more than an option to lock in a price and quantity at which one could purchase Latch's hardware and software, with no

---

[8] Pre-Merger Registration Statement at p. 148 (emphasis added).
[9] Pre-Merger Registration Statement at p. 149 (emphasis added).

promise of payment. The LOIs existed, but the purported feasibility of converting the LOI to actual revenue often—indeed, frequently—did not.

66.     In fact, based upon information and belief, the LOI conversion rate was as low as 25-40%.

67.     A key issue with converting an LOI to an actual sale was retrofitting, the process by which an older building would be updated to allow for Latch device use. While a client who owned multiple buildings might initially intend to install Latch devices in ten of them, which the LOI would then reflect, older buildings often presented major structural issues that would prevent Latch device installation from being economically feasible.

68.     Contrary to this reality, the Pre-Merger Registration Statement stated that Latch expected that retrofit opportunities would continue to increase significantly:

> Currently we primarily serve the rental homes markets in North America. Based on internal research and external reporting, we estimate there are approximately 32 million multifamily apartment home units in North America. Today we primarily serve new construction and retrofit buildings. ***Since our launch in 2017, we have seen the share of our business coming from retrofit opportunities increase significantly: a trend we expect to continue over the medium term***. We also serve the single-family rental market through our existing relationships with large real estate developers and owners. Based on internal research and external reporting, we estimate there are 15 million single-family rental home units in North America.[10]

---

[10] Pre-Merger Registration Statement at p. 134 (emphasis added).

69.    There was no warning in the Pre-Merger Registration Statement about the risk of Latch device installations not being feasible in older buildings.

70.    As noted in the Pre-Merger Registration Statement, the LOIs also did not include sales discounts. But, upon information and belief, the average discount received by customers hovered above 20% in February 2021. Relying on the LOIs as the basis for Latch's sales thus also artificially inflated sales numbers by excluding the reality of discounts.

71.    Defendant Schoenfelder and others notably found it important to identify as a "Risk Factor" in the Pre-Merger Registration Statement the Company's retention of him:

> The loss of services of senior management or other key employees could significantly delay or prevent the achievement of our development and strategic objectives. ***In particular, we depend to a considerable degree on the vision, skills, experience, and effort of our co-founder, Chairman, and Chief Executive Officer, Luke Schoenfelder***."[11]

72.    Risks involving LOIs were, on the other hand, starkly absent from discussion in the Risk Factors.

73.    But the LOIs were not the only misrepresentations in Latch's financials, although they affected nearly every other Key Business Metric.

---

[11] Pre-Merger Registration Statement at p. 26 (emphasis added).

***Hardware sales were materially inflated by early delivery***

74.     Hardware sales were also misstated.

75.     Regarding hardware sales, the Pre-Merger Registration statement notes, in relevant part,

> We generate hardware revenue primarily from the sale of our portfolio of devices both first-party and third-party for our smart access and smart building solutions. We sell hardware to building developers through our channel partners who act as the intermediary and installer. ***We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer***. The Company provides warranties related to the intended functionality of the products and those warranties typically allow for the return of defective hardware up to one year for electrical components and five years for mechanical components past the date of sale. We are currently in the process of developing and manufacturing our new generation of hardware products with much lower production costs which we expect will improve our future hardware margins.[12]

> * * *

> We currently generate revenue primarily from two sources, hardware devices and software products. ***Revenue is recognized upon transfer of control of promised goods or services to customers at transaction price***. The Company estimates the transaction price, including variable consideration, at the commencement of the contract and recognizes revenue over the contract term.[13]

76.     But in order to "recognize revenue" earlier, Latch employed a system that materially manipulated hardware sales numbers. Latch would recognize revenue based on shipments of product by quarter. If Latch was not meeting the quotas

---

[12] Pre-Merger Registration Statement, at p. 149.
[13] Pre-Merger Registration Statement, at p. 156.

management desired, employees were instructed to ship products to customers who did not yet need them, solely for the goal of recognizing revenue. For example, in June a shipment of hardware might go to a customer who did not have a contract to begin installation until December, if the channel partner or customer would agree to hold on to it. But by transferring control of the goods, Latch could then recognize the revenue for that quarter.

77.    At times, these shipments would go to individual clients or channel partner contacts, who would store them in their homes or garages. And, upon information and belief, the recipient would sometimes return the shipment after the quarter's end.

78.    Latch materially misrepresented its hardware sales in the Pre-Merger Registration Statement.

### Smart Home technology

79.    Latch often touted its "Smart Home" integration software, which Latch stated was a driver of a $0.8 million increase in hardware revenue in the second half of 2020.[14]

80.    The idea behind the Smart Home technology was to provide an all-encompassing technology home ecosystem for the customers. The Pre-Merger Registration Statement described this as a factor pertaining to TSIA's board of

---

[14] Pre-Merger Registration Statement at p. 153.

directors' support for the Merger:

> *Large and Expanding Growth Industry*. Latch primarily serves the rental homes market in North America, which comprises approximately 32 million multifamily apartment home units and 15 million single-family rental home units in North America. ***Latch is well positioned to take advantage of the growth in the smart home market, as well as to pursue other opportunities in adjacent segments, including expansion into the commercial office segment***.

> *Attractive Business Model with Recurring Revenue Stream*. Latch provides a full-service smart home ecosystem for customers*. **Its integrated product, which delivers a building software solution delivered through Latch hardware, allows for significant customer retention through long-term contracts, which generate high quality, long-term recurring software revenues***.[15]

81.    Latch also stated its vision in its Company Overview:

> After Latch has been installed and set up at a building, the building managers add all their residents as users to the Latch system. Our mobile applications then enable the residents to unlock all connected spaces in Latch buildings from the front door, package rooms, common spaces, elevators, and garages to their unit entrance, control their thermostat and smart home devices from the app, see who rang the bell at the front door through the intercom and let guests in through the app. In the near future, we believe interacting with services, buying renters insurance or choosing their internet package will all be possible from the Latch App. Residents become highly engaged users across all the capabilities that Latch provides them in their spaces.[16]

82.    But the Smart Home technology lacked a proof of concept and did not function. Latch continued to "book" it in the LOIs, but there were no clients to serve as references for it.

---

[15] Pre-Merger Registration Statement at p. 189 (emphasis added).
[16] Pre-Merger Registration Statement at p. 133.

83.     Upon information and belief, the first building that the Smart Home technology was installed in was a major failure. Latch nonetheless touted the technology as a basis for its continued expansion and growth.

84.     Smart Home technology is not mentioned in the Risk Factors.

85.     TSIA and Latch materially misrepresented the functionality of, and growth opportunity presented by, the Smart Home technology.

### *Booked Home Units—Cumulative*

86.     Upon information and belief, Latch also inflated the numbers it presented for "Booked Home Units—Cumulative."

87.     The Pre-Merger Registration statement states,

> We use Booked Home Units—Cumulative **to measure the number of homes signed to operate on our platform, market penetration in the rental homes market, and the size opportunity to grow revenue from increasing sales of additional hardware, software, and service revenue into signed homes**. Booked Home Units represent the total number of apartment units or similar dwellings installed cumulatively, as well as committed to be installed, with Latch products.[17]

88.     But, in reality, given the issues with retrofitting and the lack of a proof of concept for the Smart Home technology, the "size opportunity to grow revenue for additional hardware, software, and service revenue" was overstated. The problem was twofold: (1) the units that were counted as growth opportunities might never be compatible with Latch devices (lack of feasibility of retrofitting); and (2) even if

---

[17] Pre-Merger Registration Statement at p. 149 (emphasis added).

they were generally compatible, many of the devices which Latch forecasted for growth lacked a proof of concept and did not actually exist.

89.     TSIA and Latch materially misrepresented the Booked Home Units.

***International expansion***

90.     The Pre-Merger Registration Statement notably represented that Latch was positioned to quickly expand its international reach:

> Today, we only operate in the United States and Canada. While these geographies present sizable opportunities for Latch, our solution set is well-positioned to enter new geographic markets such as Europe. We see a near-term opportunity to expand into France, Germany, and the United Kingdom with the support of Tishman Speyer and current customers as our anchor partners in these regions.[18]

91.     Latch mentions its business in Canada multiple times throughout the Pre-Merger Registration Statement, creating an image of a truly international business. In fact, its business in Canada was extremely limited, to just one wholesaler partnership. Due to legal reasons, Canada could not use all of the products, and because the applications were not bilingual (in both English and French) they could not legally be used in certain provinces, including Quebec.

92.     Latch's statement that it was "well-positioned" to enter new geographic market such as Europe was also untrue, for similar reasons.

93.     The software was not available in other languages, and Latch was not

---

[18] Pre-Merger Registration Statement at p. 138.

well-positioned to make it so—as illustrated by its failure to effectively gain traction in many Canadian markets. Aside from the United Kingdom, this presented serious issues with the purported international expansion.

94.     Upon information and belief, Latch has to date not expanded into any additional international markets and is not present in Europe.

95.     Latch materially misrepresented its international brand and its opportunity to grow internationally at a rapid pace.

96.     In sum, the Pre-Merger Registration Statement was materially false and misleading because it: (1) falsely represented the Company's sales revenue which was based primarily on bookings of non-binding letters of intent that in reality in no way could lead to the revenue Latch projected; (2) grossly misrepresented the "typical" timeline for converting a letter of intent into a sale; (3) misrepresented the ease and feasibility of retrofitting buildings booked in connection with the letters of intent; (4) inflated hardware sales by delivering hardware to clients before projects were due to begin in order to recognize additional revenue on a quarterly basis; (5) touted technology and products that either did not have a proof of concept and would not be usable or deliverable; and (6) overstated the "international market" Latch had and would be able to expand into.

*Notifications of Late Filing*

97.     On August 10, 2022, Latch filed a Form 12b-25 Notification of Late

Filing with the SEC. It noted that,

The Audit Committee of the Company's Board of Directors has commenced an investigation (the "Investigation") of alleged current and prior period matters that include, but may not be limited to, certain aspects of the Company's **current and historic key performance indicators and revenue recognition practices**, including the accounting treatment, financial reporting and internal controls related thereto. As the Investigation includes matters related to accounting for the quarter ended June 30, 2022, the Company is unable to file the Quarterly Report at this time. Following the completion of the Investigation, the timing of which cannot be estimated, the Company will make a determination regarding whether any revision, correction or restatement of its financial statements for any previous quarter or fiscal year will be made, as well as the timing of filing the Quarterly Report.

98.     On August 25, 2022, Latch announced that the Company would be

restating its consolidated financials statements for 2021 and 2022 as a result of its

investigation.

99.     On November 10, 2022, Latch again filed a Form 12b-25 Notification

of Late Filing, citing the ongoing investigation and that it had been expanded to

include an investigation of the Company's financial statements for 2019 and 2020.

100.   Upon information and belief, these recent filing for Latch refer in part

to the material misrepresentations alleged herein.

## FORUM SELECTION CLAUSE

101.   This Court has jurisdiction over this dispute pursuant to 10 Del. C. Section 341.

102.   Latch has adopted a forum selection clause that provides for this Court to be the sole and exclusive forum for the filing of this action, including any claim for asserting a cause of action arising under the Securities Act of 1933.

103.   Specifically, the Second Amended and Restated Certificate of Incorporation for Latch provides in Article IX as follows:

> Unless the Corporation consents in writing to the selection of an alternative forum, (a) the Court of Chancery (the "Chancery Court") of the State of Delaware (or, in the event that the Chancery Court does not have jurisdiction, the federal district court for the District of Delaware or other state courts of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action, suit or proceeding brought on behalf of the Corporation, (ii) any action, suit or proceeding asserting a claim of breach of a fiduciary duty owed by any director, officer or stockholder of the Corporation to the Corporation or to the Corporation's stockholders, (iii) any action, suit or proceeding arising pursuant to any provision of the DGCL or the bylaws of the Corporation or this Second Amended and Restated Certificate (as either may be amended from time to time) or (iv) any action, suit or proceeding asserting a claim against the Corporation governed by the internal affairs doctrine; and (b) subject to the preceding provisions of this Article IX, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. If any action the subject matter of which is within the scope of clause (a) of the immediately preceding sentence is filed in a court other than the courts in the State of Delaware (a "Foreign Action") in the name of any stockholder, such stockholder shall be deemed to have consented to (x) the personal jurisdiction of the state and federal courts in the State of Delaware in connection with any action brought in any such court to enforce the provisions of clause (a) of the immediately

preceding sentence and (y) having service of process made upon such stockholder in any such action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

Any person or entity purchasing or otherwise acquiring any interest in any security of the Corporation shall be deemed to have notice of and consented to this Article IX. Notwithstanding the foregoing, the provisions of this Article IX shall not apply to suits brought to enforce any liability or duty created by the Securities Exchange Act of 1934, as amended, or any other claim for which the federal courts of the United States have exclusive jurisdiction.

## COUNT I

**Against All Defendants**
**For Violations of Section 11 of the Securities Act**

104.   Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein.

105.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiff and all members of the Class, against the Defendant

106.   This Count does not sound in fraud.  Plaintiff does not allege in this Count that the Company or the Individual Defendants committed intentional or reckless misconduct or that the Company or the Individual Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim. This claim is based on strict liability.  Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims.

107.   Latch issued stock via the Pre-Merger Registration Statement. Latch is strictly liable for each false and misleading statement contained therein.

108.   The Individual Defendants named herein were responsible for the contents and dissemination of the Pre-Merger Registration Statement.

109.   The Pre-Merger Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

110.   The Company is the issuer of the securities acquired by Plaintiffs and the Class.  As such, the Company is strictly liable for the materially inaccurate statements contained in the Pre-Merger Registration Statement and the failure of the Pre-Merger Registration Statement to be complete and accurate.

111.   Defendants Schoenfelder, Speyer, Wong, Kazam, Rubio, Segal, and Volpi were each signatories of the Pre-Merger Registration Statement and proxy/prospectus therein, therefore, they each had a duty to make a reasonable investigation of the statements contained in the Registration Statement and Proxy-Prospectus to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions

contained in the Pre-Merger Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As a result, each of these Defendants are liable to Plaintiff and the Class.

112.   The remaining Individual Defendants were named as persons in the Pre-Merger Registration Statement who already were or were going to become a directors in Latch. They therefore each had a duty to make a reasonable investigation of the statements contained in the Registration Statement and Proxy-Prospectus to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, Director Defendants should have known of the material misstatements and omissions contained in the Pre-Merger Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As a result, each of these Defendants are liable to Plaintiff and the Class.

113.   None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Pre-Merger Registration Statement were true and without omissions of any material facts and were not misleading.

114.   Defendants caused to be issued and participated in the issuance of materially false and misleading written statements were contained in the Pre-Merger

Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.

115.   By reasons of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act. As a direct and proximate result of Defendants' wrongful conduct, the price for Latch common stock was artificially inflated, and Plaintiff and the Class suffered substantial damages in connection with their acquisition of such Latch common stock

116.   Plaintiff and the other Class members acquired Latch shares pursuant and/or traceable to the Pre-Merger Registration Statement.

117.   Plaintiff and other Class members acquired their Latch stock without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Class were damaged by Defendants' misconduct and by the material misstatements and omissions in the Pre-Merger Registration Statement. The value of Latch shares has declined substantially subsequent to and due to the Defendants' violations.

118.   This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the Merger.

## COUNT II

### Against All Individual Defendants
### For Violations of Section 15 of the Securities Act

119.   Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein.

120.   This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

121.   This Count does not sound in fraud.  Plaintiff does not allege that the Individual Defendants committed intentional or reckless misconduct or that the Individual Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

122.   The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Latch within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Latch to engage in the acts described herein.

123.   The Individual Defendants were each a culpable participant in the violations of Section 11 of the Securities Act alleged in the first Count above, based on their having signed the Pre-Merger Registration Statement or being named therein, and having otherwise participated in the process which allowed the Merger to be successfully completed.

124.   By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## DEMAND FOR JURY TRIAL

127.   Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and relief in his favor and in favor of the Class, and against Defendants, as follows:

A.   Declaring that this Action is properly maintainable as a class action;

B.   Certifying the Class;

C.   Awarding damages to Plaintiff and members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

E.   Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

DATED: January 11, 2023

DELEEUW LAW LLC

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (#3569)
1301 Walnut Green Road
Wilmington, DE  19807
(302) 274-2180
brad@deleeuwlaw.com


*Of Counsel*

Brent B. Barriere
Jason W. Burge
Kaja S. Elmer
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
bbarriere@fishmanhaygood.com
jburge@fishmanhaygood.com
kelmer@fishmanhaygood.com

*Attorneys for Plaintiff*